24CA1770 Gallegos v ICAO 05-15-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1770
Industrial Claim Appeals Office of the State of Colorado
WC No. 5-118-378

Albert Gallegos,

Petitioner,

v.

Industrial Claim Appeals Office of the State of Colorado, Ammex Masonry, and
Pinnacol Assurance,

Respondents.

ORDER AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Pawar and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 15, 2025

Albert Gallegos, Pro Se

No Appearance for Respondent Industrial Claim Appeals Office

Alenka J. Han, Denver, Colorado, for Respondents Ammex Masonry and
Pinnacol Assurance

¶ 1 Claimant, Albert Gallegos, appeals a final order of the Industrial Claim Appeals Office (the Panel) affirming an administrative law judge's (ALJ) determination that Gallegos must repay benefits and mileage reimbursement due to fraud. We affirm.

## I. Background

### A. Medical History

¶ 2 Gallegos began working for Ammex Masonry as a forklift operator in January 2019. He sustained an admitted work-related injury to his neck on September 5, 2019. Gallegos was diagnosed with cervical (neck) and thoracic (back) strain at Midtown Occupational Health Services (Midtown). During an examination at Midtown, a physician assistant-certified (the PA-C) found that Gallegos had full range of motion of his shoulders, cervical spine, and thoracic spine. Gallegos reported having low back surgery in 2012 but no other relevant medical history. The PA-C prescribed Naproxen, advised Gallegos to apply ice and heat three times daily, and released him to full work duty. Gallegos did not complete his shift the next day, however, reporting that he could not tolerate the vibration from his forklift.

¶ 3    Gallegos then began treatment with Dr. Lloyd Thurston, an Authorized Treating Physician (ATP) at Midtown. Gallegos told Dr. Thurston that he also injured his left shoulder on the date of the accident. Dr. Thurston prescribed additional medications, physical therapy, and massage, and restricted Gallegos from working until a follow-up appointment. Subsequent magnetic resonance imaging (MRI) showed no fractures or ligament injury, but some degenerative changes. After several weeks of care, Dr. Thurston released Gallegos to restricted work duty in late October 2019. After working for two days, Gallegos asserted he could no longer work due to pain, and he never returned to work.

¶ 4    In November, Dr. Thurston referred Gallegos to an orthopedist, who ordered steroid injections. A month later, Ammex and its insurer, Pinnacol Assurance (jointly, the employer), filed a General Admission of Liability and provided medical benefits, Temporary Total Disability (TTD) benefits, and reimbursement for Gallegos's mileage to attend appointments and pick up prescriptions. The employer provided these benefits to Gallegos over the next three years.

¶ 5    In early 2020, Dr. Thurston retired, and Dr. Lon Noel at Midtown became Gallegos's ATP.  Gallegos told Dr. Noel that his neck pain was worsening, and Dr. Noel eventually diagnosed Gallegos with cervical radiculopathy.  Dr. Noel referred Gallegos to a surgeon, who performed a cervical discectomy and fusion in October 2020.

¶ 6    Two months after the surgery, Gallegos reported to Dr. Noel that his left shoulder pain and mid-back conditions had rendered him unable to get out of bed without help.  Dr. Noel referred him to Dr. Yusuke Wakeshima.  Dr. Wakeshima diagnosed Gallegos with degenerative cervical disc disease and noted that Gallegos complained of pain in his neck, mid-back, and shoulder.  He treated Gallegos over the next two years with medication and physical therapy.

¶ 7    Meanwhile, Gallegos had an MRI on his left shoulder and thoracic region.  The thoracic MRI showed some mild degenerative disease but no evidence of acute abnormality.  The shoulder MRI showed several tears in the tendon, and Gallegos was referred to another surgeon who performed a left shoulder arthroscopy in November 2021.

¶ 8      By March 2022, Dr. Noel's progress notes indicated that Gallegos reported he "is doing better overall."  Dr. Noel noted that Gallegos's "neck range of motion ha[d] basically plateaued," but that he was having very little neck pain and no arm pain.  Dr. Noel referred him for a functional capacity evaluation.  During the evaluation, however, Gallegos complained that his pain levels rendered him unable to complete it.  On April 28, 2022, Dr. Noel placed Gallegos at Maximum Medical Improvement (MMI).  (MMI is defined as "a point in time when any medically determinable physical or mental impairment as a result of injury has become stable and when no further treatment is reasonably expected to improve the condition."  § 8-40-201(11.5), C.R.S. 2024.)  Dr. Noel also assigned permanent impairment ratings (IR) for Gallegos's neck, thoracic spine, and left shoulder, with his thoracic and cervical spine IRs combining for a 30 percent whole person IR.

¶ 9      The employer scheduled an independent medical exam with Dr. Scott Primack, who examined Gallegos and reviewed his medical records.  Dr. Primack agreed that Gallegos had reached MMI but disagreed with the IR.

¶ 10   The employer then requested a division-sponsored independent medical exam (DIME).  The DIME physician, Dr. Stanley Ginsburg, reviewed Gallegos's medical history beginning on the date of the injury.  During the DIME, Gallegos reported his 2012 back surgery and the surgeries in 2020 and 2021, but "denied any other medical history."  Dr. Ginsburg agreed with Dr. Noel that Gallegos had reached MMI on April 28, 2022, and assigned a combined 39 percent whole person IR.

## B.   Procedural History

¶ 11   The employer applied for a hearing to overcome the DIME physician's MMI findings and IR.  In his response, Gallegos requested that the hearing include consideration of permanent partial and total disability benefits, medical benefits, and disfigurement benefits.

¶ 12   After an investigation, the employer filed another application for a hearing that added the issues of overpayment and repayment of benefits based on fraud.  The employer's investigation showed that Gallegos had asserted prior workers' compensation claims and applied for Social Security Disability Insurance (SSDI) benefits on multiple occasions based on alleged neck, back, and shoulder

5

injuries. The investigation also involved surveillance videos of Gallegos walking, standing, and carrying objects without difficulty. One video, taken on the date of the DIME, showed Gallegos dancing.

¶ 13     The ALJ issued a thirty-page order (the ALJ order) following a two-day hearing. In the ALJ order, the ALJ found that Gallegos's "level of function was, more likely than not, much greater than he represented to his health care providers." The ALJ also found that Dr. Ginsburg's DIME report "was highly probably incorrect." The ALJ credited Dr. Primack's opinions over those of Dr. Ginsburg. Dr. Primack opined that a cervical MRI taken in connection with a 2018 SSDI examination — before the 2019 work accident — was the same as the cervical MRI taken after the accident.

¶ 14     The ALJ concluded that the work accident may have temporarily aggravated Gallegos's pre-existing conditions, and that Gallegos had a "significant history of cervical spine injuries dating to at least 2009." The ALJ determined that, by February 2020, however, Gallegos had undergone sufficient treatment and reached MMI for the work-related temporary exacerbation of pre-existing symptoms. The ALJ also found that, because Gallegos failed to

6

disclose his medical history, Dr. Ginsburg was deprived of necessary information to assess an IR. After reviewing the evidence, the ALJ determined that Gallegos had a zero percent IR for his shoulder, cervical spine, and thoracic spine as a result of the September 2019 accident.

¶ 15 The ALJ found that Gallegos received an overpayment of TTD benefits in the amount of $76,112.36. The ALJ based those findings, in part, on the video surveillance of Gallegos walking, standing, and dancing between September 2021 and April 2022, when Gallegos was still representing to his providers that he was unable to work. The ALJ found that Gallegos fraudulently obtained TTD benefits due to his misrepresentations regarding the extent of his injury and ability to work.

¶ 16 The ALJ also found that Gallegos submitted over one hundred mileage reimbursement requests, in which he misrepresented his actual mileage. He had requested mileage reimbursements for medical visits that did not occur, trips to pharmacies on dates when no prescriptions were disbursed, and trips from Fairplay to Denver when, in fact, Gallegos stayed in Denver. The ALJ found that Gallegos knowingly submitted false mileage reimbursement

requests and ordered him to repay $8,985.60 in mileage reimbursements.

¶ 17 However, the ALJ rejected the employer's argument that Gallegos should also repay medical benefits. The ALJ found that, while Gallegos's "concealment of his prior conditions likely influenced his providers' treatment decisions," the evidence did not establish that "all treatment after [the date of injury] was induced by fraud."

¶ 18 Gallegos appealed the ALJ order to the Panel, which entered a final order (the Panel order) affirming the ALJ order as supported by substantial evidence in the record. Gallegos now appeals the Panel order.

## II. Issues on Appeal

¶ 19 Gallegos, representing himself on appeal, contends that

- the ALJ improperly found that he reached MMI in February 2020;

- he did not misrepresent his condition to providers;

- the testimony concerning mileage fraud was conflicting;

- the ALJ prevented him from questioning several witnesses; and

8

- the matter was improperly assigned to a new ALJ after the first ALJ became unavailable.

¶ 20 In its answer brief, the employer characterized the issues as whether substantial evidence in the record supported the ALJ's findings that (1) the employer overcame, by clear and convincing evidence, the DIME physician's MMI date and IR; (2) the employer proved that Gallegos fraudulently received $76,112.36 in TTD benefits; and (3) the employer proved that Gallegos fraudulently obtained reimbursement for $8,985.60 in claimed medical mileage expenses. The employer also asserts that Gallegos did not articulate any basis for setting aside the ALJ's decision based on evidentiary rulings concerning the examination of witnesses or the reassignment of the case to a different ALJ to prepare the ALJ order.

### III. Standard of Review

¶ 21 As relevant here, we may only set aside the Panel order if "the findings of fact are not supported by the evidence; that the findings of fact do not support the order" or the "denial of benefits is not supported by applicable law." § 8-43-308, C.R.S. 2024. "If the findings of fact entered by the [ALJ] are supported by substantial

9

evidence, they shall not be altered by the court of appeals." *Id.* "Substantial evidence" is "that quantum of probative evidence that a rational fact finder would accept as adequate to support a conclusion, without regard to the existence of conflicting evidence." *Life Care Ctrs. of Am. v. Indus. Claim Appeals Off.*, 2024 COA 47, ¶ 14, 553 P.3d 905, 908.

## IV.   Analysis

### A.    ALJ's Findings as to IR and MMI

¶ 22    A DIME physician's opinions concerning MMI and permanent medical impairment may only be overcome by clear and convincing evidence.  § 8-42-107(8)(b)(III), C.R.S. 2024.  Clear and convincing evidence means evidence that is "highly probable and free from serious or substantial doubt."  *Metro Moving & Storage Co. v. Gussert*, 914 P.2d 411, 414 (Colo. App. 1995).  It is solely for the trier of fact to determine the persuasive effect of the evidence and whether the challenging party has satisfied the party's burden of proof.  *Id.*

¶ 23    To overcome a DIME physician's IR, a party must present evidence demonstrating it is "highly probable" that the rating is incorrect.  *Leming v. Indus. Claim Appeals Off.*, 62 P.3d 1015, 1019

(Colo. App. 2002). The weight and credibility to give to expert witnesses' testimony is within the ALJ's discretion and may not be disturbed absent a showing that the ALJ's credibility determination is "overwhelmingly rebutted by hard, certain evidence to the contrary." *Loofbourrow v. Indus. Claims Appeals Off.*, 321 P.3d 548, 552-53 (Colo. App. 2011), *aff'd sub nom. Harman-Bergstedt, Inc. v. Loofbourrow*, 2014 CO 5, 320 P.3d 327.

¶ 24    After a thorough review of the record, we agree with the Panel that the ALJ did not err by finding that the employer overcame the DIME physician's conclusions as to the IR and date of MMI. The ALJ credited Gallegos's medical records showing he was originally diagnosed with a thoracic strain on the date of the injury and reported thoracic pain until December 2019, but that he did not report such pain again until substantially later. The ALJ observed that "no provider ha[d] offered a cogent, credible opinion as to how [the] thoracic spine symptoms after December 2019 were causally related to" the work injury. In addition, the ALJ found that, while Gallegos initially reported shoulder pain to Dr. Thurston about a week after the work accident, his shoulder showed good function and strength by November 2019, and Gallegos did not complain of

shoulder pain again until December 2020. Further, the ALJ found that, because Gallegos "affirmatively misrepresented his cervical spine history" to the DIME physician, that physician's IR was "highly probably incorrect." The ALJ reasoned that Gallegos's functioning in the cervical spine was "already limited" before the work accident. The ALJ ultimately relied on Dr. Primack's opinion, based on the MRI evidence, that the work accident did not cause permanent impairment to the cervical spine.

¶ 25    The ALJ noted that, while the employer urged an MMI date of September 19, 2019, that date was solely based on the date of the cervical MRI. Instead, the ALJ found that Gallegos reached MMI on February 2, 2020, the date of Dr. Noel's first visit examination. The ALJ also found that, by that time, Gallegos "had undergone significant conservative treatment" and reached MMI for "work-related temporary exacerbation of his pre-existing cervical spine condition."

¶ 26    Gallegos points to several medical records to support his argument that he did not reach MMI in February 2020. We note that many of those records predate February 2020; for example, Gallegos extensively refers to records from November 2019 and

January 2020. Those records do not controvert the ALJ's conclusion that Gallegos reached MMI after those dates. The medical records that Gallegos cites predating the MMI consistently reflect degenerative changes. The ALJ evaluated the medical records in their entirety and found that, by February 2, 2020, after "significant conservative treatment," including physical therapy, massage, and injections, Gallegos had reached a point of MMI for his "work-related temporary exacerbation of his pre-existing cervical spine condition." Gallegos points to his surgeries after the MMI date, but the ALJ found that those surgeries were not causally related to the work injury.

¶ 27 Under our narrow standard of review, even if Gallegos presented some evidence which, if credited, would support results contrary to those the ALJ reached, that evidence would provide no basis for relief on appeal. *See Cordova v. Indus. Claim Appeals Off.*, 55 P.3d 186, 191 (Colo. App. 2002). We may not interfere with an ALJ's resolution of conflicts in the evidence. *Id.* Gallegos is essentially asking us to reweigh the evidence and to substitute our judgment for the ALJ, which we have no authority to do. *See City of Durango v. Dunagan,* 939 P.2d 496, 498 (Colo. App. 1997).

Therefore, like the Panel, we must affirm the ALJ's findings as to MMI and IR.

## B. TTD Fraud

¶ 28    The ALJ found that the employer had proved that Gallegos "obtained TTD benefits through fraud by misrepresenting to and concealing from his health providers his levels of function and ability to perform work."

¶ 29    Section 8-43-303(1), C.R.S. 2024, provides that an ALJ may review any award on the ground of fraud, and section 8-42-101(6)(a), C.R.S. 2024, allows recovery of the cost of care from a claimant in the case of fraud.  In this case, the ALJ did not grant the employer's request to repay the cost of care, which was at least $121,884.61, because the ALJ determined that the employer did not establish that all treatment after the date of injury was induced by fraud.  But the ALJ concluded that Gallegos fraudulently induced the employer to pay TTD and mileage reimbursement benefits.

¶ 30    To prove that a claimant received benefits fraudulently, an employer must establish the elements of fraud: (1) a false representation of a material existing fact; (2) knowledge on the part

14

of the one making the representation that it was false; (3) ignorance on the part of the one to whom the representation was made of its falsity; (4) the representation was made with an intention that it be acted on; and (5) the representation resulted in damage. *Se. Colo. Water Conservancy Dist. v. Cache Creek Mining Tr.*, 854 P.2d 167, 172 (Colo. 1993); *see also Vargo v. Colorado Industrial Commission*, 626 P.2d 1164, 1166 (Colo. App. 1981) (upholding a finding of fraud where the claimant had misrepresented the extent of his injury and prior medical history).

¶ 31 The medical treatment records from Dr. Thurston and Dr. Noel reveal that Gallegos did not tell them about the previous work injuries to his neck and back. It was only through the employer's investigation that Gallegos's true medical history was discovered. The investigation revealed:

- Gallegos sustained a work-related injury to his lumbar and cervical spine in March 2009 while working for another masonry company. He received significant treatment and was assigned an IR of 23 percent after reaching MMI. That claim was settled in 2011.

- Gallegos applied for and received SSDI benefits in late 2011. At the time, he represented to the Social Security Administration that he could not work due to disability.

- In 2015, he claimed neck and back injuries while working for another masonry company. That claim was settled in 2016.

- In several subsequent SSDI benefit hearings, he asserted that he was unable to work due to back, neck, and arm pain.

- On April 10, 2019, while working for the employer, he submitted a verification of disability to the Jefferson County Housing Authority, in which he represented that his physical disability rendered him unable to engage in any substantial gainful activity.

¶ 32 These incidents, combined with the surveillance videos, led the ALJ to conclude that Gallegos had intentionally concealed his significant prior medical conditions to obtain workers' compensation benefits, including TTD benefits, from the employer. Specifically, the ALJ found that, except for the periods of time when Gallegos was recovering from surgery, he intentionally

misrepresented and concealed his functional ability to work. Gallegos also knew that his misrepresentations were false because he was aware of the prior injuries, treatments, and workers' compensation claims, yet he denied any previous medical history other than the 2012 back surgery. Instead, he continually sought work restrictions from his providers; the records showed that the providers noted his "very slow and deliberate [movements] with facial grimacing and groaning." The ALJ concluded that Gallegos fraudulently induced his providers to place him on complete work restrictions. After carefully examining the record, we discern no error in these findings.

## C.    Mileage Fraud

¶ 33    During the hearing, an investigator testified that Gallegos submitted requests for medical mileage payments even though he had not traveled on the dates at issue. The ALJ credited testimony that Gallegos was actually staying in Denver when he submitted mileage reimbursement for trips from Fairplay to Denver. While Gallegos contends that the ALJ should have instead believed his testimony to the contrary, we cannot substitute our judgment for that of the ALJ regarding credibility matters. *See Halliburton Servs.*

*v. Miller*, 720 P.2d 571, 577 (Colo. 1986).  The investigator's testimony was corroborated by deposition testimony from Gallegos's landlord as to the dates Gallegos resided in Fairplay and Denver.  We found no record support for Gallegos's assertion that the employer's counsel "coerced" this testimony.

### D.    Remaining Arguments

¶ 34     Gallegos argues that the ALJ precluded him from questioning his doctors during the hearings.  But section 8-43-210, C.R.S. 2024, allows medical records, physician reports, and records of the employer to be admitted without their authors being present to authenticate them.  Therefore, his objection that he was unable to cross-examine the doctors is without foundation.

¶ 35     He also alleges error in the "reassigning" of his case to a different ALJ.  The record shows that ALJ Elsa Martinez Tenreiro initially convened the hearings in Gallegos's matter.  However, the case was reassigned to ALJ Steven Kabler when ALJ Martinez Tenreiro became incapacitated.  ALJ Kabler reviewed the hearing record and the exhibits and issued the ALJ order.  In workers' compensation cases, due process is satisfied if the ALJ either reads

18

a transcript of testimony or hears live testimony. *See Bodensieck v. Indus. Claim Appeals Off.*, 183 P.3d 684, 686 (Colo. App. 2008).

¶ 36 Because Gallegos's remaining arguments in this appeal (for instance, that Dr. Noel was "unduly influenced" by Dr. Primack's reports) are conclusory, we won't address them. *See Sanchez v. Indus. Claim Appeals Off.*, 2017 COA 71, ¶ 62, 411 P.3d 245, 259 (declining to address the claimant's argument because he offered conclusory sentences with no citations to legal authority in support of the argument).

## V. Disposition

¶ 37 The Panel order is affirmed.

JUDGE PAWAR and JUDGE LUM concur.